**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0237n.06**
**Filed: April 4, 2006**

**Nos. 04-6476, 05-5004, 05-5005**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BECKY H. MCALISTER, GREGORY | ) | EASTERN DISTRICT OF TENNESSEE |
| GRAHAM, & MICHELLE DIXON, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

Before:  GILMAN and COOK, Circuit Judges; MILLS, District Judge.[*]

PER CURIAM.  Appellants pleaded guilty to various drug charges and received sentences corresponding to the amount of pseudoephedrine possessed.  The district court sentenced each defendant under the Federal Sentencing Guidelines' Drug Equivalency Tables, determining the methamphetamine equivalents of the quantities of pseudoephedrine.  Appellants challenge the validity of the relevant Guidelines, arguing that the Sentencing Commission's promulgation of the pseudoephedrine-to-methamphetamine equivalency ratio ran afoul of the Commission's congressional directive.  Because Appellants have not shown that the Commission failed to follow Congress's mandate, we affirm Appellants' sentences.

---

[*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

I

Pseudoephedrine is "raw material" used in the manufacture of methamphetamine, and different manufacturing processes produce different yields. Before the enactment of the Guidelines at issue in this case, courts relied on expert testimony to estimate pseudoephedrine-to-methamphetamine yields. Then, in 2000, Congress passed the Methamphetamine Anti-Proliferation Act, directing the Sentencing Commission to enact a Guidelines amendment structuring the penalty for illegal possession of pseudoephedrine at a level reflective of "the quantity of [methamphetamine] that could reasonably have been manufactured" from the pseudoephedrine. Pub. L. No. 106-310, § 3651, 114 Stat. 1101, 1238-39. The Act instructed the Sentencing Commission to determine a conversion ratio for the manufacture of methamphetamine from pseudoephedrine "based on scientific, law enforcement, and other data the Sentencing Commission consider[ed] appropriate." *Id.* at 1239.

Acting on this mandate, the Sentencing Commission added tables to sections 2D1.11(d) and 2D1.1 (application note 10) of the Guidelines, establishing a two-to-one ratio of pseudoephedrine to methamphetamine. In arriving at its ratio, the Commission used "data from the Drug Enforcement Agency, Office of Diversion Control, as published on the web site of the Office of National Drug Control Policy (ONDCP). These data indicate that the actual yield of methamphetamine from ephedrine and pseudoephedrine is 'typically in the range of 50 to 75

percent.'" Proposed Amendments to the Sentencing Guidelines, 66 Fed. Reg. 7962, 7965 (Jan. 26, 2001).

After Appellants pleaded guilty to drug charges, the trial court determined their sentences according to the amount of pseudoephedrine in their possession.[1] Appellants objected to the court's use of the Sentencing Guidelines, but the district court overruled the objection.

II

Appellants challenge the validity of the portion of the Drug Equivalency Table under which they were sentenced. If in promulgating its ratio for the Drug Equivalency Table the Commission acted inconsistently with Congress's plain language, Congress's language trumps the inconsistent ratio. *United States v. LaBonte*, 520 U.S. 751, 757 (1997); *see United States v. Butler*, 207 F.3d 839, 852 (6th Cir. 2000). Yet we "'defer to [the Commission's] interpretation as long as it is "sufficiently reasonable" in light of the Congressional directive.'" *Butler*, 207 F.3d at 850 (quoting *United States v. Williams*, 53 F.3d 769, 772 (6th Cir. 1995)) (alteration in original).

Congress directed the Commission to determine the drug equivalency ratio "based on scientific, law enforcement, and other data the Sentencing Commission consider[ed] appropriate."

---

[1]Appellants McAlister and Dixon pleaded guilty to possession of chemicals and equipment used in methamphetamine manufacturing. Although Appellant Graham pleaded guilty only to possession of methamphetamine, the court imposed his sentence based on possession of both methamphetamine and pseudoephedrine, after converting the pseudoephedrine to methamphetamine under the Guidelines.

Methamphetamine Anti-Proliferation Act § 3651. In Appellants' view, the Commission based its ratio on Drug Enforcement Agency *conclusions*, and "[b]asing a decision on someone else's conclusions is all together [sic] different from analyzing the available data and reaching one's own conclusion." Appellants quote the Minutes of the Sentencing Commission: "The Commission based the proposed penalty structure on the Drug Enforcement Administration's determination that the average yield is between 50 and 75 percent." Minutes of the March 20, 2001 United States Sentencing Commission Business Meeting, http://www.ussc.gov/MINUTES/3_20_01.htm (last visited Mar. 13, 2006).

The Commission's single characterization of the DEA information—in its meeting minutes, no less—is not determinative. The Commission elsewhere characterized this information as "data": "[The ratio] is based on *data* from the DEA that the actual yield . . . is in the range of 50 to 75 percent." U.S. SENTENCING GUIDELINES MANUAL app. C (Supp. at 109-10) (2001) (emphasis added). Similarly, the Commission's Notice of Proposed Amendments describes its ratio as based on data: "This table . . . was developed from *data* from the Drug Enforcement Agency . . . . These *data* indicate that the actual yield of methamphetamine from . . . pseudoephedrine is 'typically in the range of 50 to 75 percent.'" 66 Fed. Reg. at 7965 (emphasis added). Further, even if the Commission relied on a DEA "determination," such a determination would suffice as data because the word "data" denotes "[i]nformation, esp. information organized for analysis *or used as the basis for a decision-making*." WEBSTER'S II NEW COLLEGE DICTIONARY 287-88 (2001) (emphasis added).

- 4 -

Appellants also argue that the "DEA's . . . determination that a typical yield was in the range of 50%-75% . . . conflict[ed] with other available DEA sources at the time," citing DEA testimony before Congress and before courts. *See, e.g.*, *United States v. Eschman*, 227 F.3d 886, 889 (7th Cir. 2000) ("Virginia Kleekamp, a chemist with the Drug Enforcement Administration . . . indicated that an average yield for a clandestine laboratory is from 40% to 60%, but she has noted yields as high as 85%."). Variations in the DEA's—or its employees'—yield estimates, however, do not aid Appellants' case. Congress directed the Commission to determine, "based on scientific, law enforcement, and other data the Sentencing Commission consider[ed] appropriate," the quantity of methamphetamine that "*could reasonably have been manufactured*" from pseudoephedrine. Methamphetamine Anti-Proliferation Act § 3651 (emphasis added). The Commission's determination is neither arbitrary and capricious nor otherwise unreasonable. *See United States v. Martin,* —F.3d—, 2006 U.S. App. LEXIS 4034, at *36-42 (6th Cir. Feb. 21, 2006) (rejecting an identical challenge).

Finally, Appellants contend that the Commission based the ratio only on law enforcement data and thereby failed to follow Congress's directive to base the ratio on "scientific, law enforcement, and other data the Sentencing Commission consider[ed] appropriate." Methamphetamine Anti-Proliferation Act § 3651. In *United States v. Martin*, a panel of this court employed "the rule of the last antecedent" to hold that the Congressional directive mandated that

the Commission base the ratio on, at a minimum, "scientific and law enforcement" data.[2] 2006 U.S. App. LEXIS 4034, at *20. Even if we assume, as did the panel in *Martin*, that the court may "delve into the Commission's methodology as a general matter," *id.* at *30, Appellants nevertheless fail to demonstrate that the Commission relied on law enforcement data to the exclusion of scientific data. Appellants attempt to show that the Commission utilized only law enforcement data by pointing to the Commission's statements referencing the DEA report. But, as the *Martin* panel discussed, "DEA reports could contain . . . both scientific data . . . as well as law enforcement statistics." *Id.* at *33. As in *Martin*, "[t]he record before us includes no testimony and no further documentation regarding the Commission's method of selecting the new 50% conversion ratio," and this record "do[es] not suffice to demonstrate that the Commission failed to base its ratio on both scientific and law enforcement data." *Id.* at *32.

III

Because Appellants fail to demonstrate that the Commission deviated from the congressional mandate, we discern no error in the district court's sentencing Appellants pursuant to the Drug Equivalency Tables. We affirm.

---

[2]The panel held that the restrictive clause "the Sentencing Commission considers appropriate" modifies only "other" data and not "scientific" or "law enforcement" data. The panel did not address the fact that all three adjectival terms modify the same noun, "data," so that one could conclude that the restrictive clause modifies the noun "data," which is in turn distributed across the three adjectival terms.

**RONALD LEE GILMAN, Circuit Judge.** I concur in the result reached by the majority opinion and, in large part, with its reasoning. Nevertheless, I write separately because I disagree with the comment set forth in footnote 2 regarding *United States v. Martin*, 438 F.3d 621 (6th Cir. 2006). As the author of the *Martin* opinion, I believe that the panel in that case properly applied the rule of the last antecedent to the statute at issue.